**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1931**

BROWN & PIPKINS, LLC, d/b/a Acsential Services,

Plaintiff – Appellant,

v.

SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 32BJ,

Defendant – Appellee.

**No. 15-1987**

BROWN & PIPKINS, LLC, d/b/a Acsential Services,

Plaintiff – Appellee,

v.

SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 32BJ,

Defendant – Appellant.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:15−cv−00526−CMH−TCB)

Argued: October 26, 2016                                    Decided: January 23, 2017

Before KING, KEENAN, and DIAZ, Circuit Judges.

---

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Judge King and Judge Keenan joined.

---

**ARGUED:** Stephen Gregory Joy, SMITH, CURRIE & HANCOCK LLP, Washington, D.C., for Appellant/Cross-Appellee. Andrew Lee Strom, SEIU, LOCAL 32BJ, New York, New York, for Appellee/Cross-Appellant. **ON BRIEF:** Stephen J. Kelleher, SMITH, CURRIE & HANCOCK LLP, Washington, D.C., for Appellant/Cross-Appellee.

---

DIAZ, Circuit Judge:

Brown & Pipkins, LLC, doing business as Acsential Services ("B&P") appeals the district court's confirmation of four labor arbitration awards, and Service Employees International Union, Local 32BJ cross-appeals for attorneys' fees after the district court failed to address its entitlement to fees. We affirm the confirmation of the arbitration awards, based in large part upon the limited scope of our review of a labor-arbitration decision pursuant to a collective bargaining agreement (a "CBA"), and hold that the Union waived its claim for attorneys' fees by not complying with Federal Rule of Civil Procedure 54.

I.

A.

In September 2012, B&P began providing janitorial services for the Department of the Army at Fort Belvoir in Fairfax County, Virginia. Janitorial employees worked without a CBA until May 17, 2013, when B&P and the Union signed a CBA which recognized the Union as the exclusive bargaining representative for B&P's janitorial employees at Fort Belvoir. The CBA was retroactive to September 4, 2012.

In the spring and summer of 2013, the Union filed notices that it intended to arbitrate four separate grievances with B&P related to alleged violations of the CBA. The parties chose Arbitrator Garvin Lee Oliver to hear each grievance, and no transcripts were taken at the hearings. We describe relevant parts of the grievances and corresponding arbitration awards seriatim.

3

1.

On May 29, 2013, the Union filed a grievance alleging that B&P violated the CBA by reducing the full-time work schedule from 40 to 35 hours per week on January 16, 2013. The Shop Steward spoke with B&P management about the reduction in hours on the same day that B&P announced the change, but B&P would not recognize the Union or discuss grievance issues. B&P claimed that it cut employees' hours as a result of a decision by the Army to decrease funding for the B&P contract from approximately $177,903 per month to approximately $154,500 per month.

The arbitrator granted the grievance in part and issued what we refer to as the Hours Reduction Award. In granting the grievance, the arbitrator weighed conflicting provisions in the CBA. Article 3 of the CBA, titled "Management Rights," comprises three Sections which, in sweeping language, vest certain "rights, prerogatives, and functions" in B&P. J.A. 261. Relevant here, Article 3, Section 2 reserves to B&P the right to "adjust schedules of work and work assignments based on its judgment of business requirements," and Article 3, Section 3 provides that "[s]uch managerial right[s] shall not be the subject of any provision of the Agreement or of mandatory bargaining between" B&P and the Union. J.A. 261. But Article 6 of the CBA, titled "Hours of Work," also addresses the scheduling of work. Article 6, Section 1 provides: "An employee who is regularly schedule[d] for thirty five (35) hours or more per week shall be consider[ed] full time. The workweek for all full time employees shall be 40 hours per week, 8 hours per day, Monday through Friday." J.A. 263.

The arbitrator reconciled these provisions by reasoning that "Article [3], Sections 2 and 3 gave [B&P] the general right to schedule work . . . but Article 6, Section 1 impliedly restricted [B&P's] right to schedule work relating to the duration of work for full time employees." J.A. 48. Accordingly, the arbitrator held that B&P "violated Article 6, Section 1 of the [CBA] on January 16, 2013 when it reduced the work day by one hour for all janitorial full time employees." J.A. 48.

The arbitrator also rejected B&P's argument that the grievance was procedurally defective because the Union failed to comply with the CBA's Grievance and Arbitration Procedure. Article 11, Section 2 of the CBA splits the Grievance and Arbitration Procedure into three Steps, relevant parts of which we reproduce here:

> Step 1[:] The Shop Steward must discuss the grievance with the project manager within three (3) days of the incident. [B&P] shall render a decision in writing within twenty-four (24) hours after the conclusion of Step 1.
> . . . .
> Step 3: Arbitration: . . . .
> . . . .
> The Arbitrator shall have jurisdiction and authority to apply, interpret and determine compliance with the terms of this Agreement, but in no case add to, deviate from, detract from or alter in any way the provision of the Agreement.

J.A. 266–67.

The arbitrator began by noting that the Union had failed to abide by Step 1's three-day limit to discuss grievances, as the parties, with B&P's reserving its right to bring a timeliness challenge, "agreed to consider the [May 29, 2013] grievance initiation letter as [S]tep 1 of the grievance procedure." J.A. 47. Nevertheless, the arbitrator reasoned that it would have been "unreasonable to require strict compliance with the time limits" in this

5

case. J.A. 48. In particular, the arbitrator identified two "mitigating circumstances": (1) the National Labor Relations Board was "processing" a dispute between the Union and B&P regarding the "processing of grievances prior to the" adoption of the CBA in 2012, and (2) the violation was of a "continuing nature." J.A. 47–48.

The Hours Reduction Award orders B&P to, inter alia, restore the 40-hour workweek for full-time janitorial employees and pay employees for any lost hours incurred while the 35-hour workweek was in effect.

2.

On July 12, 2013, the Union filed a grievance alleging that B&P violated the CBA by paying two employees, Alicia Duran and Susana Cortez, at the "Custodians" rate instead of at the higher "Custodian/Driver" rate commensurate with their responsibilities. The arbitrator granted the grievance and issued what we refer to as the Drivers' Pay Award.

Article 16 of the CBA lists three wage classifications, including "Custodians" and "Custodian/Driver," but does not define them other than by providing corresponding rates of pay. "Custodian/Drivers" are paid $0.60 more per hour than "Custodians."

The arbitrator traced the origins of the "Custodian/Driver" classification to a letter of understanding that the Union and one of B&P's predecessors at Fort Belvoir negotiated in 2008. That letter of understanding provided that the predecessor would pay "$0.60 per paid hour more to the custodial service workers who drive our vehicles in order to transport workers to various sites." J.A. 135. The arbitrator found that the letter of understanding was the "genesis" for, and thus informed the definition of, the

6

"Custodian/Driver" classification. The arbitrator noted that the rate appeared in previous CBAs between the Union and B&P's predecessors, and that those predecessors had paid employees at that rate when they had transported workers to their worksites, brought equipment to their worksites, and driven to multiple locations within Fort Belvoir.

The arbitrator then examined the type of work that B&P assigned to Duran and Cortez. He found that B&P assigned them to schedules that "included multiple buildings, some of which were far apart," and "required [them] to alternate driving themselves and another custodian . . . in their own personal vehicles to the buildings they were required to clean." J.A. 53. Additionally, he found that B&P required them to "carry equipment from the office to these buildings," and that B&P generally refused to provide either with "a company car, driver's pay, or regular gas reimbursement." J.A. 53–54.

Based upon the similarities between the work performed by Duran and Cortez and the work performed by employees whom B&P's predecessors had paid at the "Custodian/Driver" rate, the arbitrator concluded that B&P violated Article 16 of the CBA by not paying Duran and Cortez at the higher rate. The arbitrator rejected B&P's argument that, per the letter of understanding, neither employee could be characterized as a "Custodian/Driver" because each generally drove her own vehicle. The arbitrator reasoned that B&P's predecessors had provided corporate vehicles in similar circumstances, and thus B&P could not escape paying the higher rate by requiring the employees to use their own vehicles.

7

The Drivers' Pay Award ordered B&P to, inter alia, pay Duran and Cortez at the "Custodian/Driver" rate and provide back pay based upon an eight-hour day, pursuant to the Hours Reduction Award.

3.

The Union filed a second grievance on July 12, 2013, alleging that B&P violated the CBA by unreasonably denying employees' requests for vacation time. According to the arbitrator, "[a]t the hearing on January 23, 2015 the parties stipulated to the issue: Whether custodial employees are owed unused vacation in the form of money, and what is the amount of accumulated vacation creditable to each employee." J.A. 369. B&P, however, contends that it objected at the beginning of the hearing to recharacterizing the grievance from denying vacation time to withholding vacation pay, preserved its right to call the grievance untimely, and, rather than stipulating to the issue that the arbitrator described, stipulated only "that the grievance was agreed to have been presented to [it] as of [January 23, 2015]." J.A. 369.

After the hearing, the parties agreed to submit the case for decision based on exhibits and briefs. In its brief, B&P argued, inter alia, that the vacation pay grievance was untimely because the Union did not present it to B&P management within three days of the incident giving rise to the grievance. In an interim order, the arbitrator rejected B&P's timeliness argument, concluding that B&P had "waived its right to invoke the time limits of the [CBA] where the issue was raised for the first time after the hearing in which the parties stipulated to the issue in the case." J.A. 369. The arbitrator

8

acknowledged B&P's contention that the parties had made a different stipulation, but stated that he had "no recollection of [that] stipulation." J.A. 369.

The arbitrator subsequently granted the grievance in part and issued what we refer to as the Vacation Pay Award. The Vacation Pay Award ordered B&P to pay certain employees for accrued, unused vacation benefits and to comply with applicable regulations.

4.

On August 1, 2013, the Union filed a grievance alleging that B&P owed money to Maria Amaya and Ana Guerrero for 14 and 27 hours of work, respectively. B&P allegedly paid each employee the amount requested in the grievance in 2014. B&P then allegedly paid each employee the amount requested in the grievance for a second time in 2015, and sent purported records of those payments to the arbitrator and the Union on January 19, 2015. Nevertheless, the arbitrator held a hearing the next day, which only the Union attended. According to B&P, it did not attend the hearing because it had submitted proof of payment to the arbitrator.

The arbitrator granted the grievance and issued what we refer to as the Monies Owed Award. That award ordered B&P to, inter alia, pay Amaya and Guerrero for the number of hours specified in the grievance, with interest. The award also provided that B&P "shall be given credit for any back pay or other payments previously made that are consistent with this Award." J.A. 155.

In a later order, the arbitrator denied B&P's request to "waive or reduce the fees for arbitration services" for the hearing. J.A. 431–34. The arbitrator noted that the

records of payment that B&P sent to him "did not indicate . . . that the case was settled," and that he "could not determine from the two documents that the amounts were correct to cover all aspects of the grievance, including interest, etc." J.A. 432. In March 2015, B&P allegedly paid each employee the interest amount contemplated in the Monies Owed Award.

B.

B&P filed a complaint in the Eastern District of Virginia seeking to vacate the Hours Reduction Award and the Drivers' Pay Award. The Union filed an answer and counterclaim to confirm all four arbitration awards and to receive "reasonable attorneys' fees and costs." J.A. 150. In a corresponding brief, the Union made its argument for attorneys' fees. B&P then filed an answer—including an affirmative defense that the Monies Owed Award was moot—and a counterclaim-in-reply to vacate the Vacation Pay Award. In a corresponding brief, B&P responded to the Union's argument for attorneys' fees.

The district court confirmed all four arbitration awards. The court reasoned that "all of the Arbitrator's awards arose directly from the [CBA] and his interpretation of that agreement," and that "none of the[] awards were irrational or evidence manifest disregard of law." J.A. 439–40. The court did not address the issue of attorneys' fees, and the Union did not submit a motion for attorneys' fees after the court entered its order.

B&P's appeal and the Union's cross-appeal followed.

10

## II.

We address B&P's appeal of the district court's confirmation of the four arbitration awards and the Union's cross-appeal for attorneys' fees in turn.

## A.

While B&P makes different arguments against confirmation for each arbitration award, our standard of review remains the same. This court "review[s] de novo the district court's denial of a motion to vacate an arbitration award." *Jones v. Dancel*, 792 F.3d 395, 401 (4th Cir. 2015). This case arises under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, "as the controversy involves an assertion of rights under an agreement between an employer and a labor organization." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam). Our review of a labor-arbitration decision pursuant to a CBA is "very limited":

> Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. . . . [I]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision. It is only when the arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable. When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's improvident, even silly, factfinding does not provide a basis for a reviewing court to refuse to enforce the award.

*Id.* (internal citations and quotation marks omitted); *see also PPG Indus., Inc. v. Int'l Chem. Workers Union Council of United Food & Commercial Workers*, 587 F.3d 648, 652 (4th Cir. 2009) (applying the standard of review outlined in *Garvey*).

11

1.

B&P makes two arguments for why the Hours Reduction Award should be vacated, and, in the alternative, an argument for why it should be modified to run from the date that the Union filed the grievance. We reject each argument.

a.

We first consider B&P's argument for vacatur based on the arbitrator's failure to sufficiently construe substantive provisions in the CBA. In particular, B&P says that the arbitrator "manifestly disregarded" the sweeping language in Article 3 of the CBA, which vests certain management rights in B&P, and exceeded his authority by using Article 6, Section 1 of the CBA to modify Article 3 while simultaneously disregarding the part of Article 6, Section 1 which authorizes a 35-hour workweek.

Our review of the Hours Reduction Award shows that, rather than "manifestly disregarding" relevant portions of the CBA, the arbitrator construed that document in coming to his decision, which precludes vacatur on this ground. *Garvey*, 532 U.S. at 509; *see also PPG Indus.*, 587 F.3d at 653 (reversing vacatur where arbitrator interpreted the CBA and characterizing company's argument that arbitrator ignored plain language of the CBA as "an [impermissible] attack on the *correctness* of the arbitrator's decision"). Specifically, the arbitrator weighed Article 3's Management Rights provisions against the part of Article 6, Section 1 which provides that "[t]he workweek for all full time employees shall be 40 hours per week, 8 hours per day," and concluded that the latter controlled because it "impliedly restricted [B&P's] right to schedule work." J.A. 48.

12

By balancing competing provisions in the CBA and coming to a conclusion, the arbitrator cleared the very low bar needed to insulate the award from a charge that he failed to construe the CBA. B&P's arguments on this point amount to an impermissible attack on the correctness of the arbitrator's decision. That is true notwithstanding the fact that, as B&P points out, the arbitrator failed to explicitly deal with the part of Article 6, Section 1 which provides that "[a]n employee who is regularly schedule[d] for thirty five (35) hours or more per week shall be consider[ed] full time." J.A. 263.

To require an arbitrator to address every single provision of any relevance whatsoever in a contract would be to require an arbitrator's award to be free of ambiguity—a standard we have rejected. *PPG Indus.*, 587 F.3d at 652 (citing *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 598 (1960)). Indeed, the facts here are a far cry from those in the rare cases where this court has vacated a labor arbitrator's award. *See Kennametal, Inc. v. United Steelworkers Of Am., AFL-CIO CLC*, 96 F. App'x 851, 854–55 (4th Cir. 2004) (per curiam) (affirming vacatur where arbitrator "intentionally ignored pertinent portions of the CBA"); *Champion Int'l Corp. v. United Paperworkers Int'l Union, AFL-CIO*, 168 F.3d 725, 731 (4th Cir. 1999) (vacating award where arbitrator based award on a contract from which he "had no contractual authority . . . to make" an award); *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union*, 76 F.3d 606, 609–10 (4th Cir. 1996) (affirming vacatur where "arbitrator blatantly ignored the unambiguous language of [the company's] Drug Policy [which required employee's termination] and [instead] fashioned a modified penalty that

13

appealed to his own notions of right and wrong" and lacked support from any part of the CBA).

b.

We next consider B&P's argument that vacatur is warranted because the arbitrator exceeded his authority by finding the grievance timely under the continuing violation doctrine. We conclude that the arbitrator was within his authority to do so.

There is no dispute that under Article 11, Section 2, Step 3, the question of procedural arbitrability was for the arbitrator to decide. As such, the deferential standard of judicial review which applies to a labor arbitrator's determination on the merits also applies to the threshold decision of procedural arbitrability. *Nat'l Postal Mail Handlers Union v. Am. Postal Workers Union*, 589 F.3d 437, 441–42 (D.C. Cir. 2009) (citing *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).[1] Whether the arbitrator made the correct decision is, of course, disputed.

By waiting until May 29, 2013, to file this grievance, the Union failed to comply with Article 11, Section 2, Step 1 of the CBA's Grievance and Arbitration Procedure, technically rendering the grievance untimely. The arbitrator nevertheless found the grievance timely for two reasons: (1) the existence of a dispute between the Union and B&P regarding the processing of grievances prior to the adoption of the CBA in 2012,

---

[1] Though *National Postal Mail Handlers Union* arose in the postal context, the court noted that "the standard for judicial review of arbitration awards in the postal context is the same as the standard . . . for judicial review of labor arbitration awards under § 301 [of the Labor Management Relations Act]." 589 F.3d at 440–41.

14

and (2) the "continuing nature" of the violation. J.A. 48. Because B&P's argument focuses on the arbitrator's second justification and we find that justification sufficient to support the arbitrator's decision on timeliness, we do not consider the validity of the arbitrator's first justification.

"The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop— is equally a part of the [CBA] although not expressed in it." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581–82 (1960). "There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties." *McCormick v. AT & T Techs., Inc.*, 934 F.2d 531, 536 (4th Cir. 1991) (en banc) (quoting *Warrior & Gulf Navigation Co.*, 363 U.S. at 579).

One such substantive background principle of law is the common-law continuing violation doctrine, which arbitrators have invoked—and courts have to various degrees acknowledged—as standing for the proposition that a violation which is continuous in nature gives rise to a new grievance each day. *See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Wise Alloys, LLC*, 807 F.3d 1258, 1272–73 (11th Cir. 2015) (affirming application of the continuing violation doctrine where violation was company's failure to deduct a cost-of-living allowance from a weekly health-care premium); *Nat'l Postal Mail Handlers Union*, 589 F.3d at 439–44 (affirming arbitrator's interpretation of agreement to "incorporate a 'continuing violations' theory under which" he could hear disputes about

15

pre-1992 work assignments that continued after 1992 even though agreement banned new disputes regarding pre-1992 work assignments); *El Mundo Broad. Corp. v. United Steelworkers of Am., AFL-CIO CLC*, 116 F.3d 7, 10 (1st Cir. 1997) (rejecting application of the continuing violation doctrine where the violation in question was the failure to post a job opening, but in dicta acknowledging the doctrine when the violation is a "daily failure to pay").

The underlying violation in this grievance is B&P's failure to pay employees their bargained-for salary. Because that violation is continuous in nature, the arbitrator arguably construed the CBA when he looked beyond the express provisions in the Grievance and Arbitration Procedure and applied the continuing violation doctrine to find the grievance timely. And even if we were "convinced he committed serious error" in doing so, which is an issue we do not reach, that would "not suffice to overturn" the Hours Reduction Award. *Garvey*, 532 U.S. at 509.

c.

Finally, we consider B&P's contention that, in the alternative to vacatur, the Hours Reduction Award should not apply retroactively but rather should run from the date of the grievance. As to this question, we give arbitrators wide latitude to formulate remedies:

> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations.

*Enter. Wheel & Car Corp.*, 363 U.S. at 597.

We are mindful, however, that our deference is not unlimited. Some courts that have applied the continuing violation doctrine in the labor arbitration context have, in dicta, cautioned against using it to authorize relief that precedes the filing of the technically untimely grievance. *See Wise Alloys*, 807 F.3d at 1272–73 (implying in dicta that using the continuing violation doctrine to award retroactive relief could constitute reversible error, as it would effectively rewrite the grievance procedures); *UMass Mem'l Med. Ctr., Inc. v. United Food & Commercial Workers Union*, 527 F.3d 1, 7 (1st Cir. 2008) (affirming arbitrator's application of the continuing violation doctrine and in dicta noting that "there was no question of retroactivity of relief or harm to settled expectations because the arbitrator refused to award a retroactive remedy").

We understand the animating principle of these notes of caution to be respect for settled expectations. Under the deferential standard of review that we apply to the arbitrator's remedy, *Enter. Wheel & Car Corp.*, 363 U.S. at 597, and cognizant that "serious error" alone is insufficient to overturn this award, *Garvey*, 532 U.S. at 509, we find that whatever harm there is to B&P's settled expectations is too insignificant to warrant relief. The Shop Steward spoke with B&P management about the reduction in hours on the day that B&P announced the change. In other words, B&P was on notice of a potential grievance from day one. Moreover, the Union did not wait for over four months to file the grievance in order to surprise B&P. Rather, employees worked without a CBA until May 17, 2013, and B&P would not recognize the Union or discuss grievance issues on January 16, 2013 (when the violation first occurred).

17

Based upon the peculiar facts of this case, we find that the arbitrator did not "dispense his own brand of industrial justice" by ordering damages retroactive to the day that B&P announced the reduction in hours. *Garvey*, 532 U.S. at 509 (alteration omitted). Rather, we characterize the Hours Reduction Award as a product of the arbitrator's bringing his "informed judgment to bear in order to reach a fair solution of a problem." *Enter. Wheel & Car Corp.*, 363 U.S. at 597.

In sum, the district court did not err in confirming the Hours Reduction Award.

2.

B&P contends that the Drivers' Pay Award should be vacated for three reasons. First, the arbitrator wrongly found that B&P refused to provide the grievants with company cars. Second, the arbitrator failed to credit relevant testimony favorable to B&P. Third, the arbitrator exceeded his authority by construing the word "drivers" to include employees like Duran and Cortez, who did not drive B&P's vehicles.

We reject B&P's first two arguments, because they amount to an impermissible attack on the arbitrator's honest findings of fact. *Garvey*, 532 U.S. at 509. As for B&P's third argument, our review of the Drivers' Pay Award reveals that the arbitrator did not come close to exceeding his authority. Instead, as arbitrators are allowed to do, he construed the CBA by looking to extrinsic evidence to define an ambiguous term. *See PPG Indus.*, 587 F.3d at 653–54 (upholding labor arbitrator's right to look to extrinsic evidence to give meaning to ambiguous terms).

Faced with wage classifications left undefined by the CBA, the arbitrator gave meaning to the "Custodian/Driver" classification by looking to a letter of understanding

18

between the Union and one of B&P's predecessors and the work performed by employees whom B&P's predecessors had paid at the "Custodian/Driver" rate. Based upon the similarities between the work performed by the grievants and the work performed by employees whom B&P's predecessors had paid at the "Custodian/Driver" rate, the arbitrator concluded that the grievants were entitled to be paid at that rate as well. The arbitrator was at all times construing the CBA in the course of this analysis, including when he reasoned that B&P could not avoid paying the higher rate by requiring Duran and Cortez to drive their own cars.

Accordingly, the district court did not err in confirming the Drivers' Pay Award.

3.

B&P contends that the Vacation Pay Award should be vacated for two reasons. First, at the January 2015 hearing, the arbitrator improperly allowed the Union to recharacterize the grievance from denying vacation time to withholding vacation pay. Second, the Union violated the CBA's Grievance and Arbitration Procedure by waiting until January 2015 to bring a grievance for a vacation-pay policy that B&P put into effect in April 2013. B&P also insists that it never waived its objection to the timeliness of the grievance. For its part, the Union contends that the arbitrator correctly found that B&P stipulated to recharacterizing the grievance.

B&P's arguments against confirmation of the Vacation Pay Award all fail for the same reason: the arbitrator found that B&P waived its objection to the timeliness of the grievance by stipulating to the issue at the January 2015 hearing. "[C]ourts presume that the parties intended arbitrators, not courts, to decide disputes about the meaning and

19

application of particular procedural preconditions for the use of arbitration. These procedural matters include claims of waiver . . . ." *BG Grp. PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1207 (2014) (internal citation and quotation marks omitted). To that end, "[p]arties to an arbitration may stipulate the issues they want determined and increase or limit the arbitrator's contractual authority by their express submission." *Hill v. Staten Island Zoological Soc'y, Inc.*, 147 F.3d 209, 214 (2d Cir. 1998). According to the arbitrator, the Union and B&P did just that—they stipulated to the arbitrability of a recharacterized and otherwise untimely grievance, thereby waiving any objections to timeliness.

B&P's argument amounts to an attack on the arbitrator's finding that the parties stipulated to the recharacterized grievance at the January 2015 hearing. But there is no transcript of the hearing, and the Union contests B&P's argument. Indeed, the arbitrator acknowledged B&P's claim that the parties made a different stipulation, but stated that he had "no recollection of" the alternative stipulation and "wrote down for [his] record the one [that B&P contests on appeal] with information provided by both parties." J.A. 369. Once again, we will not entertain an attack on the arbitrator's honest findings of fact. *Garvey*, 532 U.S. at 509.

Thus, the district court did not err in confirming the Vacation Pay Award.

4.

Finally, B&P contends that the dispute underlying the Monies Owed Award is moot, and therefore confirmation is improper. In particular, B&P argues that it has twice before paid the grievants the amounts awarded by the Monies Owed Award and that after

20

the arbitrator issued the award it paid the grievants the interest amounts specified in the award.  B&P also claims that the district court treated its affirmative defense of mootness as a request for vacatur.  The Union, however, refuses to concede that B&P made the payments it claims to have made to the grievants, and asks that we confirm this award.

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *United States v. Springer*, 715 F.3d 535, 540 (4th Cir. 2013) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).  "A case becomes moot *only* when it is impossible for a court to grant *any* effectual relief whatever to the prevailing party."  *Id.* (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012)).  As an initial matter, B&P is correct that the district court apparently analyzed the Monies Owed Award as if B&P had requested vacatur rather than as if B&P had raised mootness as an affirmative defense to confirmation.  The district court never considered whether a live controversy existed.  Notwithstanding that error and the evidence of payment that B&P has entered into the record, however, we find that confirmation of the Monies Owed Award is proper because a live controversy regarding the award exists.[2]

The arbitrator never found that B&P complied with the Monies Owed Award. Rather, in an order denying B&P's request to modify his fees for the January 2015

---

[2] We do not reach the question of whether a federal court may confirm a labor arbitration award where there is no live controversy between the parties regarding the award necessitating judicial enforcement. *See 1199 SEIU United Healthcare Workers E. v. Civista Med. Ctr., Inc.*, No. DKC 10-0479, 2011 WL 310486, at *2 (D. Md. Jan. 28, 2011) (collecting cases on the topic, which has divided the circuits).

21

hearing which B&P did not attend, the arbitrator wrote that the records of payment which B&P sent to him and which B&P argues here demonstrate compliance with the Monies Owed Award "did not indicate . . . that the case was settled." J.A. 432. That statement by the arbitrator, the district court's failure to address the issue, and the Union's insistence that a controversy still exists convince us that it is not impossible to grant any effectual relief by affirming the confirmation of the Monies Owed Award. In arriving at that conclusion, we are mindful that the arbitrator's award provides that B&P "shall be given credit for any back pay or other payments previously made that are consistent with this Award." J.A. 155.

For these reasons, the district court did not err in confirming the Monies Owed Award.

## B.

The controlling issue in the Union's cross-appeal for attorneys' fees is whether its failure to submit a motion for fees pursuant to Federal Rule of Civil Procedure 54(d) waived the claim. Beyond rebutting that proposition, the Union makes a number of arguments in its cross-appeal. It contends that it should be awarded attorneys' fees because B&P's challenges to the awards were presumptively unjustified attempts to relitigate the arbitrations on the merits, and that the district court abused its discretion by not explaining why it denied attorneys' fees. But antecedent to those arguments is the question whether the Union preserved its right to recover attorneys' fees by properly asking for them. We think not, because the Union failed to abide by Rule 54(d)'s requirements, thereby waiving its claim.

22

"In general, 'the decision whether and in what amount to award attorney fees is one commit[t]ed to the award court's discretion, subject only to review for abuse of that discretion.'" *Andrews v. Am.'s Living Ctrs., LLC*, 827 F.3d 306, 312 (4th Cir. 2016) (alteration in original) (quoting *United Food & Commercial Workers, Local 400 v. Marval Poultry Co.*, 876 F.2d 346, 350–51 (4th Cir. 1989)). But "it may be revealed upon inspection that such a decision actually turned on an express or implicit finding of fact or conclusion of law that dictated the ultimate result." *Marval Poultry*, 876 F.2d at 351. We review questions of law, including an interpretation of a Federal Rule of Civil Procedure, de novo. *Bosley v. Mineral Cty. Comm'n*, 650 F.3d 408, 411 (4th Cir. 2011).

1.

In this case, we cannot undertake an "inspection" of the district court's order to decipher whether it "turned on an express or implicit finding of fact or conclusion of law that dictated the ultimate result," as opposed to an exercise of the district court's "available discretion," or even some combination of all of the above. *Marval Poultry*, 876 F.2d at 351. That is because the district court said nothing about attorneys' fees. On its face, that silence could be construed as an abuse of discretion, as "[p]erhaps [abuse of discretion's] most obvious manifestation is in a failure or refusal, either express or implicit, actually to exercise discretion." *James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993).

But we do not review the district court's silence in a vacuum. Instead, we consider the surrounding facts. The Union devoted a section of its brief in support of enforcing the arbitration awards to the issue of attorneys' fees, and B&P did the same in

23

its rebuttal brief in support of its motion to vacate the Vacation Pay Award. After the district court confirmed the four awards, the Union failed to submit a motion for attorneys' fees. Thus, the Union did not comply with Rule 54(d), which, subject to certain exceptions that we describe below and find inapplicable here, provides the procedural framework for requesting attorneys' fees. Mindful that we cannot divine the district court's intentions from its silence, we nevertheless find that its decision necessarily turned, at least in part, on an interpretation of Rule 54(d). Because we need only interpret Rule 54(d) to resolve this cross-appeal, and we review an interpretation of a Federal Rule of Civil Procedure de novo, we apply that standard.

2.

Rule 54(d) provides that "[a] claim for attorney's fees . . . must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Fed. R. Civ. P. 54(d)(2)(A). Section 301 of the Labor Management Relations Act, under which this case arises, does not require that attorneys' fees be proved at trial as an element of damages or otherwise provide for an award of attorneys' fees. *Marval Poultry*, 876 F.2d at 350. As a result, the plain language of Rule 54(d) required that the Union's claim for attorneys' fees be made by motion.

Rule 54(d) goes on to specify:

> Unless a statute or court order provides otherwise, the motion must: (i) be filed no later than 14 days after the entry of judgment; (ii) specify the judgment and the statute, rule, or other grounds entitling the movant to the award; [and] (iii) state the amount sought or provide a fair estimate of it.

Fed. R. Civ. P. 54(d)(2)(B)(i)–(iii). Here, no statute or court order "provides otherwise," and none of the other exceptions to Rule 54(d) apply.[3] Accordingly, Rule 54(d) required the Union to submit a motion for attorneys' fees between 0–14 days *after* the district court issued its order. *See Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 889 (9th Cir. 2000) ("Rule 54 expressly conditions a motion for attorneys' fees on an entry of judgment."). This the Union failed to do.

The Union attempts to avoid the application of Rule 54(d) by arguing that the parties fully briefed the issue of attorneys' fees before the district court. But Rule 54(d) makes clear that a motion for attorneys' fees is not proper until after the district court has entered judgment. Even cases upon which the Union relies share this procedural posture. *See, e.g.*, *San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys.*, 568 F.3d 725, 732–33, 742 (9th Cir. 2009) (parties briefed issue of attorneys' fees in the district court after that court granted summary judgment); *Prod. & Maint. Emps.' Local 504 v. Roadmaster Corp.*, 954 F.2d 1397, 1400 (7th Cir. 1992) (plaintiffs filed a motion for attorneys' fees with the district court after that court entered judgment); *Marval Poultry*, 876 F.2d at 349 (union "moved for an award of fees" in the district court after that court

---

[3] Rule 54(d)(2)(D) provides that "[b]y local rule, the court may establish special procedures to resolve fee-related issues without extensive evidentiary hearings." There is no Local Rule in the United States District Court for the Eastern District of Virginia relevant to this issue. Rule 54(d)(2)(E) further provides that Rule 54(d)(2)'s requirements "do not apply to claims for fees and expenses as sanctions for violating these rules or as sanctions under 28 U.S.C. § 1927." Once again, these exceptions are inapplicable here.

entered judgment).  We will not insist that a district court respond to each proffered argument, regardless of whether it is properly before it.

Accordingly, the Union waived its claim for attorneys' fees by not complying with Rule 54(d).

### III.

For reasons given, we affirm the district court's confirmation order.

*AFFIRMED*